**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Lifestyle Improvement Centers, LLC,
d/b/a Positive Changes Hypnosis Centers,                    Case No. 2:13-cv-735

              Plaintiff,                    Judge Graham

     v.

East Bay Health, LLC, et al.,

              Defendants.

<u>Opinion and Order</u>

This matter is before the court on the motion of plaintiff Lifestyle Improvement Centers, LLC for a preliminary injunction to enforce a non-compete provision against defendants. The court held an evidentiary hearing on August 13, 2013 and ordered additional briefing as to whether Ohio or California law applies to this dispute. The court also advised the parties that it was considering consolidating the hearing on the preliminary injunction with the trial on the merits under Federal Rule of Civil Procedure 65(a)(2) and gave the parties an opportunity to submit additional evidence.

For the reasons that follow, the court finds that California law applies and that the non-compete provision is unenforceable under California law. Lifestyle's motion for a preliminary injunction is denied and defendants are entitled to judgment as a matter of law on Lifestyle's claims for breach of the non-compete provision.

**I.     Background**

Much of the factual background of this dispute is uncontroverted. Lifestyle is a limited liability company organized under the laws of Virginia and having its principal place of business in Dublin, Ohio. Lifestyle offers "self-improvement" hypnosis therapy – aimed at, among other things, helping individuals lose weight, manage stress, and stop smoking – and sells related self-improvement products through franchises doing business as Positive Changes Hypnosis Centers. In 2006, Lifestyle had approximately 56 franchise locations in the United States and Canada. It currently has 8 locations, none of which are in California.

Defendants Patrick and Cynthia Porter are residents of North Carolina. They are members of defendant East Bay Health, LLC, a limited liability company organized under the laws of California and having its principal place of business in California. The Porters are also members of

defendant PorterVision, LLC, a California limited liability company with its principal place of business in North Carolina.

Patrick Porter founded Positive Changes in 1987 and was its sole owner until 2003, when he sold the business to Lifestyle. Porter's involvement in the business became "marginalized" after the transaction and he left the company in 2006. P. Porter Decl., ¶ 4. The Porters and Lifestyle entered into copyright licensing agreements in 2004 and 2006 in which Lifestyle acquired the right to use certain copyrighted works owned by the Porters.

The current dispute concerns a former franchise location in Pleasanton, California. In 2009 Lifestyle entered into a franchise agreement with KC Partners to operate a Positive Changes franchise in Pleasanton. The franchise agreement contained a non-compete clause under which the franchisee agreed that "for a period of two (2) years after the termination or non-renewal of this franchise" it would not directly or indirectly "own, maintain, engage in, or participate in the operation of any other competitive business" within 50 miles of the franchised location or any other Positive Changes location. Franchise Agr., § XIII(D). The agreement also contained a choice-of-law provision selecting Ohio law. Id., § XXIV(A).

In 2011, Lifestyle and the Porters initiated discussions concerning the prospect of the Porters taking over the struggling Pleasanton franchise. At the time, the Porters were California residents. On September 28, 2011, two Lifestyle executives travelled to Pleasanton to meet with the Porters. These Lifestyle executives were Sandra Gould, president and chief operating officer, and David Kriegel, chief executive officer. The Porters had an interest in acquiring the Pleasanton location, and they exchanged a memo with Gould on October 4, 2011 outlining their plans and ideas for turning the Pleasanton location around. See Pl.'s Hearing Ex. 4.

On December 30, 2011, an Assumption and Assignment Agreement was entered into among Lifestyle, KC Partners (whose president was Sandra Gould), the Porters, and East Bay. In that agreement, the Porters and East Bay agreed to assume, perform, and be "liable for all of [KC Partners'] covenants, obligations, liabilities and responsibilities under the Franchise Agreement." Assumption and Assignment Agr., § 1(d).

On the same day, Lifestyle and East Bay entered into a separate Non-Competition Agreement, entitled the "Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement." This agreement contained a provision in which East Bay agreed, for 2 years after terminating the relationship, to refrain from "owning, managing and/or operating, directly or indirectly, a business using a [Lifestyle] type system of hypnosis services (defined as: a hypnosis

practice . . . for behavior modification, including, but not limited to, weight loss, stress management, stop smoking and golf improvement)" within 50 miles of a Lifestyle franchise location. Non-Competition Agr., § 1(i).

According to the Porters, their franchise received little support from Lifestyle and they came to a conclusion by November 2012 that the franchise could not be turned around. See P. Porter Decl., ¶¶ 17-20. On November 7, 2012, the Porters sent a letter to Gould in which they provided their evaluation of the situation, announced their intention to wind down the Pleasanton location, and, because they viewed the chances of finding a new buyer to be unlikely, stated their intention to cease operations in a 6-month span. See Pl.'s Hearing Ex. 10. Gould and Kriegel responded with a November 20, 2012 letter that expressed disappointment with the situation but concluded that "We [Lifestyle] certainly appreciate and support your decision to wind down and cease operations in Pleasanton responsibly . . . . [W]e fully anticipate working together amicably as Franchisor-Franchisee during this period in order to wind down [] the operations of the Pleasanton Center." P. Porter Decl., Ex. E., p. 8.

The Porters moved from California to North Carolina in March 2013. In their view, they took all of the steps necessary to wind down the Positive Changes location in Pleasanton. See P. Porter Decl., ¶¶ 24-25, 28-29. They sent an email to Gould on March 27, 2013 stating that "things are winding down in Pleasanton" and that they had found a chiropractor to take over the lease of the office. Pl.'s Hearing Ex. 13.

In April and May 2013, Gould sent emails to the Porters informing them that toll-free phone number for Positive Changes continued to receive calls from individuals seeking services from the Pleasanton location. See Pl.'s Hearing Ex. 14. Gould inquired whether the Porters could confirm if all advertising for the Pleasanton location had ceased. Cynthia Porter confirmed that all advertising should have ceased, but that a television station had delayed in ceasing to run a commercial. In June 2013, Gould sent several more emails informing the Porters that a handful of calls for the Pleasanton location continued to be received on the toll free number. See Pl.'s Hearing Exs. 17-19.

In this time frame, the Porters had converted the Pleasanton location into a "Smart Body Institute," operated by their business East Bay Health. The Smart Body Institute offers liposuction-type treatments, "detoxifying cleanses," "Self-Mastery Technology" provided by defendant PorterVision, and chiropractic services. Id., ¶ 26. The Porters began placing television and newspaper advertisements for the Smart Body Institute in the Bay Area market about April 30, 2013.

The advertisements offer hypnosis and electromagnetic treatments for the purpose of weight loss. See Pl.'s Hearing Exs. 21-23, 25-26.

Lifestyle filed this action in the Franklin County Court of Common Pleas on July 3, 2013. The complaint brings three causes of action. In the first two, Lifestyle alleges that defendants have breached the non-compete provisions of both the Franchise Agreement and the Non-Competition Agreement. In the third cause of action, Lifestyle alleges that defendants breached an "anti-abandonment" provision of the Franchise Agreement.

The action was removed to this court on the basis of diversity jurisdiction on July 25, 2013. On July 30, Lifestyle moved for an extension of a temporary restraining order that the state court had issued on July 16, 2013. The TRO ordered that defendants comply with the non-compete agreements they had entered into and cease advertising using the Positive Changes toll-free number or name.

The court held an evidentiary hearing on August 13, 2013 on the motion to extend the TRO and Lifestyle's request for a preliminary injunction. The court ordered additional briefing concerning whether Ohio or California law should apply, and the parties' briefing has now been received. The court also gave the parties an opportunity to submit additional evidence in view of the possibility that the court would consolidate the hearing on the preliminary injunction with the trial on the merits under Rule 65(a)(2), which provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." The parties did not submit any new evidence, nor did either party raise an objection to consolidation.

## II.    Discussion

The court must evaluate four factors in considering a plaintiff's request for injunctive relief: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." Id.

### A. Likelihood of Success on the Merits

#### 1. Choice of Law

The likelihood of Lifestyle's success on the merits depends on whether the court applies Ohio law, which generally recognizes the validity of covenants not to compete, or California law, which generally does not. Compare Lake Land Emp. Group of Akron, LLC v. Columber, 101 Ohio St.3d 242, 245, 804 N.E.2d 27, 30 (Ohio 2004) ("[T]his court has long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions.") with Cal. Bus. & Prof. Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.").

Lifestyle argues that Ohio law should apply because the parties selected Ohio law to govern their disputes in the Franchise Agreement. See Franchise Agr., § XXIV(A). The Non-Competition Agreement also selected Ohio law. See Non-Competition Agr., § 9. Defendants argue that California law should apply because California has a materially greater interest in this dispute, which will decide whether the Smart Body Institute may offer hypnosis services in Pleasanton, and because California has a fundamental public policy against covenants not to compete.

"A federal court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits." Standard Fire Ins. Co. v. Ford Motor Co., 723 F.3d 690, 692 (6th Cir. 2013). In Ohio,

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties.

Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 453 N.E.2d 683, syllabus (Ohio 1983). This holding in Schulke tracks the language of subsection (2) of the Restatement (Second) of Conflict of Laws § 187.

#### a. Subsection 1 of Section 187

Lifestyle's argument for applying Ohio law starts with the presumption that Ohio has also adopted the first subsection of Restatement § 187. This subsection provides, "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement

directed to that issue." Restatement § 187(1). The court finds, however, that Ohio has not expressly adopted § 187(1) and that the subsection would not apply here in any event.

It is true that a few courts, including this one, have made generalized statements that Ohio follows Restatement § 187. See, e.g., Issac v. Ebix, Inc., No. 2:11-cv-450, 2012 WL 1020296, at *4 (S.D. Ohio March 26, 2012). But the correct and more precise statement of law is that Ohio has adopted only § 187(2). In Schulke, the Ohio Supreme Court found that "the correct rule to apply" when parties have designated the law of a jurisdiction other than the place of performance is the rule set forth in subsection (2) of § 187. Schulke, 6 Ohio St.3d at 438-39, 453 N.E.2d at 686. The court did not adopt, approve, or even refer to subsection (1).

The Ohio Supreme Court later described the holding of Schulke as follows: "This court adopted the tests found in Section 187(2) of the Restatement of the Law 2d, Conflict of Laws (1971) 561, to decide which state's law would be followed." Sekeres v. Arbaugh, 31 Ohio St.3d 24, 25, 508 N.E.2d 941, 942 (Ohio 1987). Indeed in Sekeres the court again looked only to subsection (2) in evaluating the choice-of-law issue before it. This point was not lost on the dissent, which disagreed with the majority's outcome in applying subsection (2), but noted its approval that the majority did not apply subsection (1):

> The appellees maintain that Section 187(1) of the Restatement allows the parties to a contract to choose the law by which the contract will be interpreted and that it is unnecessary to make a determination of 'materially greater interest' under Section 187(2). The majority does not discuss Section 187(1) of the Restatement and goes directly to Section 187(2). I agree with the majority's approach. See Note, Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination? (1982), 82 Colum. L. Rev. 1659, 1660.

Sekeres, 31 Ohio St.3d at 28, 33 n. 2, 508 N.E.2d at 944, 948 n. 2 (Brown, J., dissenting).

Ohio Courts of Appeal have likewise described the scope of the holding as adopting only subsection (2): "In Schulke . . . the Supreme Court of Ohio adopted the Restatement of the Law 2d, Conflict of Laws (1971) 561, Section 187(2), which essentially provides that the parties' choice of law to govern their contract will be enforced, except where the chosen state has no substantial relationship to the parties or the transaction or when the application of its law would offend a fundamental policy of a state with a materially greater interest." Greif Packaging, LLC v. Ryder Integrated Logistics, Inc., No. L-09-1259, 2010 WL 3610588, at *3 (Ohio Ct. App. Sept. 17, 2010. See also DeSantis v. Lara, No. C-080482, 2009 WL1565068, at *3 (Ohio Ct. App. June 5, 2009) ("Ohio has adopted the Restatement of the Law 2d, Conflict of Laws (1971), Section 187(2), to determine whether the state's law chosen by the parties should govern the contractual dispute.").

This court too has looked directly to subsection (2) in making a choice of law under § 187. See Contech Constr. Prod., Inc. v. Blumenstein, No. 1:11-cv-878, 2012 WL 2871425, at **8-9 (S.D. Ohio July 12, 2012); Power Marketing Direct, Inc. v. Clark, 2:05-cv-767, 2006 WL 2583342, at **3-4 (S.D. Ohio Sept. 6, 2006); Power Marketing Direct, Inc. v. Ball, 2:03-cv-1001, 2004 U.S. Dist. Lexis 30016, at **4-5 (S.D. Ohio June 28, 2004) ("The Ohio Supreme Court has adopted § 187(2) . . . .").

The court thus concludes that Ohio has adopted only subsection (2) of Restatement § 187. But even if subsection (1) were adopted in Ohio, the court finds that it would not apply here. Parties may choose which state's law applies for a particular issue "which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement § 187(1). The Sixth Circuit, looking to the Restatement for direction in applying federal common law to a choice-of-law question in an action under the Employee Retirement Income Security Act, held that a "particular issue" is the one "being litigated": "The first step of analysis under section 187 is to determine whether the contractual parties could have resolved the particular issue being litigated by an explicit provision in the contract.  If they could have, then the choice of law provision is enforceable." DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden, 448 F.3d 918, 923 (6th Cir. 2006).  The issue being litigated was "which of two claimants is a surviving spouse and, therefore, entitled to survivor's benefits."  Id.  The court held that the parties could not have resolved this issue by agreement because applicable state law determines the definition of a "surviving spouse."  Id. (noting that while ERISA gave the parties limited authority to designate who would receive survivor benefits, the parties could not have resolved who was a "surviving spouse").

The particular issue being litigated here is the enforceability of a covenant not to compete. The parties could not have resolved this issue by agreement.  Stating, for example, that the non-compete provision was valid under Ohio or California law would not have made it so.  Two other federal district courts have reached the same conclusion.  In Pathway Medical Technologies, Inc. v. Nelson, No. CV11-0857, 2011 WL 4543928, at *2 (D. Ariz. Sept. 30, 2011), the parties to a non-compete agreement had chosen Washington law to govern.  Washington law generally enforces non-compete provisions, while the law of Arizona (where the defendant employee performed his job duties) does not.  The court held that subsection (1) did not apply because the parties could not have resolved the issue of the validity of a non-compete provision.  The court reasoned that parties should not be able to accomplish by choice of law what they could not accomplish by contract.  See also Hill v. Antioch Co., No. 8:09-cv-275, 2009 WL 3838251, at 4 n. 5 (D. Neb. Nov. 17, 2009) (holding that subsection (1) did not apply because the parties could not have resolved the issue of

the enforceability of a non-compete provision).  Cf. DCS Sanitation Mgmt, Inc. v. Castillo, 435 F.3d 892, 896 (8th Cir. 2006) (holding that subsection (1) did not apply because parties could not have resolved whether an unreasonable non-compete provision could be reformed).

Though the case law on subsection (1) is thin, the scholarship confirms the result in this case.  Subsection (1) involves only those issues that "the parties could have resolved with appropriate contractual language" – those that the law leaves "to the parties' free choice."  Richard J. Bauerfeld, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination?*, 82 Colum. L. Rev. 1659, 1660 (1982).

> [Subsection (1) involves] nothing more than the application of an interpretive or a gap-filling rule on a matter for which the parties could have specifically provided in their contract, but did not. For instance, the parties to a sales contract may omit payment terms.  Should a dispute later arise, a court may have to infer what the parties contemplated or supply standard payment terms.  When a choice of law needs to be made regarding such an issue, courts will generally follow a valid choice-of-law clause.  There can be little quarrel with this, since here the clause involves little more than incorporation by reference.
>
> Issues in [subsection (2)] involve matters beyond the parties' contractual capacity, at least according to the laws of one of the states with which the contract has contacts. For instance, an employment contract may contain a covenant not to compete that the employer's state permits, but that the employee's state proscribes.

Id. (footnotes omitted).  This approach comports with the Restatement comment to subsection (1), which states, "The rule of this Subsection is a rule providing for incorporation by reference and is not a rule of choice of law."  Restatement § 187, Cmt. c.

As another commentator explained, subsection (1) concerns only those "matters which the parties are generally considered to have the power to determine by contractual agreement."  George F. Carpinello, *Testing the Limits of Choice of Law Clauses: Franchise Contracts as a Case Study*, 74 Marq. L. Rev. 57, 60 (1990) (footnote omitted).  "For example, determinations as to the time of delivery, the method of delivery, transfer of title, and the risk of loss are matters on which the parties are generally free to determine on their own."  Id.  Subsection (2), on the other hand, "deals explicitly with issues which at least one interested jurisdiction has not left to party autonomy."  Id. at 62.  The franchisor cannot "evade the public policy of the franchisee's state by designating the law of a state which would embrace the contract as written."  Id. at 72 (footnote omitted).  See also Edgar G. McQueen, Jr., Note, *The Choice-of-Law Dilemma in Franchising*, 20 Okla. City U. L. Rev. 391, 401-402 (1995) ("[F]ranchise disputes rarely are resolved under section 187(1) because it is not generally

within the contractual capacity of the parties to avoid the protective provisions of the franchisee's state law.") (footnote omitted).

Accordingly, the court finds that § 187(1) has no application here.

**b. Subsection 2 of Section 187**

Under Schulke and subsection (2), the law of the state chosen by the parties will govern unless "application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties." Schulke, 6 Ohio St.3d 436, 453 N.E.2d 683, syllabus; Restatement § 187(2).

The inquiry under subsection (2) involves three steps. "The first step is to identify the state whose law would apply in the absence of the choice of law provision." DaimlerChrysler, 448 F.3d at 924; accord Century Business Services, Inc. v. Barton, 197 Ohio App.3d 352, 366, 967 N.E.2d 782, 793 (Ohio Ct. App. 2011). The second step is to determine whether application of the law of the chosen state would violate a fundamental policy of the otherwise applicable state law. DaimlerChrysler, 448 F.3d at 924; Century Business, 197 Ohio App.3d at 367, 967 N.E.2d at 794. And the third step is to evaluate whether the state whose law would otherwise apply has a materially greater interest than the chosen state in the determination of the particular issue.

In the absence of a choice of law provision in a contract, the law of the state with "the most significant relationship to the transaction and the parties" controls. Ohayon v. Safeco Ins. Co. of Illinois, 91 Ohio St.3d 474, 477, 747 N.E.2d 206, 209 (Ohio 2001) (quoting Restatement (Second) of Conflict of Laws § 188(1)). The following factors of § 188 of the Restatement should be considered in determining which state has the most significant relationship:

    (a)  the place of contracting,

    (b)  the place of negotiation of the contract,

    (c)  the place of performance,

    (d)  the location of the subject matter of the contract, and

    (e)  the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement § 188(2); Gries Sports Enterprises, Inc. v. Modell, 15 Ohio St.3d 284, 287, 473 N.E.2d 807, 810 (Ohio 1984).

The court concludes that California law would apply under § 188. The first and fifth factors do not favor either side, as Lifestyle entered into the contract from Ohio and defendants from

California.[1]  The remaining factors favor application of California law.  Gould and Kriegel traveled to California to meet with the Porters, and it was at this meeting that the parties initiated negotiations for the Porters to take over the Pleasanton franchise.  After the meeting, the parties negotiated respectively from Ohio and California.  Though Lifestyle had contractual obligations to perform from Ohio, the place of performance (from defendants' end) and the location of the subject matter of the contract were California.  The agreements between the parties centered on the operation of a hypnosis business in California.  The day-to-day operations and services of the franchisee were performed in California.  The franchisee's advertising channels and client base were in the Bay Area market.  Thus, California is the state having the most significant relationship to this matter.

Further, California's policy against covenants not to compete is a fundamental one.  To be "fundamental," a policy must be a "'a substantial one. . . . [A] policy of this sort will rarely be found in a requirement .  .  . that relates to formalities.'"  Century Business, 197 Ohio App.3d at 368, 967 N.E.2d at 794 (quoting Restatement § 187, Cmt. g) (footnote omitted).  Importantly "'a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal.'"  Id. (quoting Restatement § 187, Cmt. g).  California has embodied in statute a public policy against covenants not to compete: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal. Bus. & Prof. Code § 16600.  This court has determined in two prior decisions that California's policy against non-compete agreements is fundamental.  In Contech, the court held:

> Section 16600 "protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.'"  [Edwards v. Arthur Andersen LLP, 44 Cal.4th 937, 81 Cal. Rptr.3d 282, 189 P.3d 285, 291 (Cal. 2008)] (quoting Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal. App.4th 853, 27 Cal. Rptr.2d 573, 577 (Cal. App. 1994)).  The policy underpinning the law has been explained as follows: "The interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change."  Diodes, Inc. v. Franzen, 260 Cal. App.2d 244, 67 Cal. Rptr. 19, 26 (Cal. App. 1968).

. . .

---

[1] Lifestyle's argument that the place of contracting was Ohio is unavailing.  Lifestyle emphasizes that the original franchise agreement was between Lifestyle and KC Partners, both of whom had formal corporate connections to Ohio.  However, the contractual obligations that Lifestyle seeks to enforce in this action are between it and defendants.  The relevant contacts are those of defendants, not of KC Partners.

> The Court concludes that application of Ohio law to the issue of the validity of the non-compete provision of the Agreement would be contrary to the public policy of California. California's long history of ensuring its employees' right to pursue lawful employment demonstrates a powerful public policy. Keystone undertook to employ Blumenstein, a California resident, to perform its services in California. Blumenstein, as a California resident and employee, is entitled to benefit from his state's strong public policy favoring freedom of employment under these circumstances. To find otherwise would be "to allow an out-of-state employer/competitor to limit employment and business opportunities in California." [Application Grp., Inc. v. Hunter Grp., Inc., 61 Cal. App.4th 881, 901, 72 Cal. Rptr.2d 73 (Cal. App. 1998)].

Contech, 2012 WL 2871425, at **10-11. Accord Power Marketing Direct, Inc. v. Ball, 2004 U.S. Dist. Lexis 30016, at **9-10 ("Based on the clear pronouncements of both the California legislature and the courts, this Court finds that California has a fundamental public policy against the enforcement of non-competition clauses.").

Finally, the court finds that California has a materially greater interest in this dispute than does Ohio. This dispute will settle whether the defendants may continue to offer hypnosis-related services at the Smart Body Institute in Pleasanton. The Smart Body Institute advertises through California media – local television stations and print media – and targets its advertising efforts to California residents. Its clients are primarily, if not all, California residents. In other words, the business activity that Lifestyle seeks to enjoin is an activity that occurs in California, and a decision in this case will impact the provision of services to California consumers.

Accordingly, the court finds that under Schulke the law of the state of California should apply to govern the non-compete agreement between Lifestyle and defendants.

### 2. Application of California Law Renders the Non-Compete Unenforceable

"California courts have repeatedly held that section 16600 should be interpreted as broadly as its language reads." Scott v. Snelling & Snelling, Inc., 732 F. Supp. 1034, 1042 (N.D. Cal. 1990) (citing cases). Courts have thus refused to enforce non-compete clauses, regardless of whether the clauses are "reasonable." Id.; Aussie Pet Mobile, Inc. v. Benton, NO. SACV 09–1407 AG, 2010 WL 2629556, at *6 (C.D. Cal. June 28, 2010).

An exception to § 16600 is recognized when a non-compete clause is necessary to protect a former employer's trade secrets. Scott, 732 F. Supp. at 1043; Muggill v. Reuben H. Donnelley Corp., 62 Cal.2d 239, 242, 42 Cal. Rptr. 107, 398 P.2d 147 (Cal. 1965). Without elaboration, Lifestyle asserts in one of its briefs (doc. 28 at 4) that the non-compete clause is enforceable even

under California law because it was "designed to prevent unfair competition through Defendant's unfair use of Lifestyle's trade secrets."   However, Lifestyle has not identified any trade secrets that would be jeopardized by allowing the Smart Body Institute to do business.   See Agency Solutions.Com, LLC v. TriZetto Group, Inc., 819 F.Supp.2d 1001, 1015 (E.D. Cal. 2011) (holding that a plaintiff "must clearly identify what the 'thing' is that is alleged to be a trade secret" and "clearly articulate why that 'thing' belongs in the legal category of trade secret").   Regardless of the intended design of the clause, Lifestyle has submitted no evidence to show that enforcement of the non-compete is "necessary to protect" Lifestyle's trade secrets.  At most Lifestyle has shown that the Smart Body Institute offers competitive services, but it has not shown that the defendants are using Lifestyle's trade secrets.

Accordingly, the court finds that Lifestyle has failed to demonstrate a likelihood of success on the merits of its claim for breach of the non-compete agreement. [2]

### B.  Remainder of the Preliminary Injunction Factors

Likelihood of success on the merits is often the most important factor in evaluating a motion for preliminary injunctive relief.  See Jones v. Caruso, 569 F.3d 258, 277 (6th Cir. 2009); Systematic Recycling LLC v. City of Detroit, 685 F.Supp.2d 663, 671 (E.D. Mich. 2010).  Even so, the court finds that the remaining factors also weigh against granting injunctive relief.  Lifestyle has no remaining operations in California; thus, allowing defendants to operate in Pleasanton would not cause irreparable injury to Lifestyle.  And issuing a preliminary injunction would do harm to California's public interest in freedom of employment and free competition.

Lifestyle's motion for a preliminary injunction is thus denied.

## III.  Final Judgment on the Merits

The court finds that it is appropriate to enter final judgment in favor of defendants under Rule 65(a)(2) on the claims for breach of the non-compete agreements.  In light of this court's conclusion that California law applies, Lifestyle's only means of prevailing is to prove that preventing defendants from doing business is necessary to protect Lifestyle's trade secrets.  The court advised the parties that it was considering consolidation under Rule 65(a)(2) and gave the parties the opportunity to introduce additional evidence.  Lifestyle has not come forward with

---

[2] In its motion to extend the TRO (doc. 10 at 6-7), Lifestyle curiously argued that it could demonstrate a likelihood of success on a claim for trademark infringement.  However, the complaint does not assert such a cause of action and Lifestyle has not sought leave to amend its complaint.

evidence from which a factfinder could reasonably find that preventing defendants from doing business is necessary to protect Lifestyle's trade secrets.

The complaint also contains a cause of action for breach of the Franchise Agreement's clause regarding abandonment of a franchise. The Agreement provides that a franchise will be deemed to be in default if it "voluntarily abandons the Center for any cause (FRANCHISEE's failure to operate the Center more than seven (7) consecutive days without prior written approval from FRANCHISOR shall be deemed abandonment.).'' Franchise Agr., § XIV(B)(3). This claim has received little attention from the parties, but the court finds that defendants are entitled to judgment as a matter of law. Defendants have submitted a written letter signed by Gould, as president of Lifestyle, and by Kriegel, as CEO, on Lifestyle stationary. The letter is dated November 20, 2012 and it responded to the Porters' November 7 letter in which they announced their intention to wind down the Pleasanton location and to cease operations. Lifestyle's letter consented to and approved of the Porters' plan to cease operating the Pleasanton franchise: "We certainly appreciate and support your decision to wind down and cease operations in Pleasanton responsibly . . . . [W]e fully anticipate working together amicably as Franchisor-Franchisee during this period in order to wind down [] the operations of the Pleasanton Center." P. Porter Decl., Ex. E., p. 8. The court therefore finds that defendants are entitled to judgment as a matter of law on the claim for breach of the Franchise Agreement's anti-abandonment clause.

## IV.   Conclusion

Accordingly, the TRO entered by the state court and extended by this court is canceled. Lifestyle's motion for a preliminary injunction is denied, and final judgment is granted to the defendants.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: October 7, 2013